PAN AMERICAN PETROLEUM CORPO-
RATION, a corporation (formerly Stan-
olind Oil and Gas Company), Plaintiff,

v.

Francis M. GIBBONS, Trustee, and Fran-
cis M. Gibbons, individually,
Defendant.

No. C-63-57.

United States District Court
D. Utah,
Central Division.

Feb. 28, 1958.

Clinton D. Vernon and Wayne C. Durham, Salt Lake City, Utah, for plaintiff.

Clair M. Senior (of Senior & Senior), Salt Lake City, Utah, for defendant.

CHRISTENSON, District Judge.

By this suit plaintiff, Pan American Petroleum Corporation (formerly Stanolind Oil & Gas Company), seeks to recover from the defendant, Francis M. Gibbons as trustee and individually, rentals paid by it to the Bureau of Land Management on oil and gas leases theretofore assigned by plaintiff to the defendant Gibbons as trustee.

On or about February 21, 1956, plaintiff assigned to, and there were accepted by the defendant as trustee, six federal oil and gas leases. One of these was terminated without the accrual of additional rental. Defendant did not file for approval, or take any further action with respect to, the other five leases. Because of the termination as of March 1, 1956 of the unit agreement covering them, the terms of these leases were automatically extended for a period of

two years (30 U.S.C.A. § 226e [1]), whereas otherwise their terms would have expired during the summer or fall of 1956. Rentals for the sixth year of these leases falling due in that period, and the plaintiff being the record owner of the leases, the latter received demands for and paid under protest the rentals; it now seeks to recover from the defendant the amount of such payment.

As bases for its claim, plaintiff asserts that the defendant was under a duty imposed by law to file the assignments of the five leases, with executed requests for approval, with the Utah Land Office of the Bureau of Land Management and to take such other action as might be necessary to save plaintiff harmless from liability subsequently accruing under said leases; that the assignment of the leases was valid and binding as between the parties and that upon their execution and delivery, notwithstanding the fact that their assignment had not been approved by the Bureau of Land Management, plaintiff did not have the right without incurring legal liability to the defendant to surrender or relinquish them or to file any notices or consents subjecting the leases to the automatic termination provisions of Public Law 555, 85 Cong. 2d Session, 68 Stat. 585, 30 U.S.C.A. § 188 [2]; that the defendant's neglect to file the assignments for approval and to take such other action as might be necessary to save plaintiff harmless and free from loss constituted a breach of his legal duty; and that, in any event, there was either an express or implied contract that plaintiff would file said assignments with executed requests for approval.

The defendant's position is that he had no legal duty or obligation, either implied by law or under any express or implied contract to file the assignments with executed requests for approval, or to take any other action with respect to the assignments or leases; that plaintiff was expressly advised that he could not do so unless and until certain preliminary questions involving the trust were determined; that defendant received no notice of the termination of the Hill Creek Unit Agreement until after the rental had accrued and thus had no notice that under 30 U.S.C.A. § 226e the leases would continue, with continued liability for rent, for an additional two-year period; that plaintiff, itself, was negligent in failing to advise the defendant of the termination of the Hill Creek Unit Agreement and in failing to execute and file Public Law 555 notices making the leases subject to the automatic terminations for non-payment of rentals, and that if there were no negligence in this respect it would be because Public Law 555 applied to these leases without any notice or consent to its application, notwithstanding that the leases antedated the law, and that, therefore, plaintiff's payment of rentals was voluntary and did not give rise to any right for reimbursement.

The facts of this case have been largely stipulated as indicated by the pretrial order, and the agreed facts as con-

---

1. "* * * Any lease which shall be eliminated from any such approved or prescribed plan, or from any communitization or drilling agreement authorized by this section, and any lease which shall be in effect at the termination of any such approved or prescribed plan, or at the termination of any such communitization or drilling agreement, unless relinquished, shall continue in effect for the original term thereof, but for not less than two years, and so long thereafter as oil or gas is produced in paying quantities."

2. 30 U.S.C.A. § 188. "* * * Notwithstanding the provisions of this section, however, upon failure of a lessee to pay rental on or before the anniversary date of the lease, for any lease on which there is no well capable of producing oil or gas in paying quantities, the lease shall automatically terminate by operation of law. * * *"

43 C.F.R. § 192.161(a). "* * * Any lessee of a lease which issued prior to July 29, 1954 may at any time prior to the anniversary date of such lease and the accrual of rental, elect to subject his lease to the automatic termination provisions of this section by notifying, in writing, the manager of the appropriate land office to that effect."

tained in paragraph 4, subdivisions (1) to (18) of that order are hereby adopted as findings of fact by the Court.

■ There remain certain issues of fact reserved in the pre-trial order upon which there is no agreement, and these issues will now be considered. Whether there was an established custom in the oil and gas industry that an assignee of a federal oil and gas lease would secure the approval of the Bureau of Land Management to the assignment or take other appropriate steps to save the assignor harmless or whether the defendant was chargeable with knowledge of any such custom, is not touched upon by the record. I can find no evidence answering the question of whether defendant on or after June 12, 1956 and prior to the respective fifth anniversary dates of the leases made specific representations to the plaintiff that defendant would file the assignments for approval prior to the anniversary dates. In the absence of such evidence, a resolution of the issues so far as material goes against the party having the burden of proof thereon. I must find that on or subsequent to January 12, 1956, the defendant did not expressly agree with the plaintiff to file the assignments, with executed requests for approval, with the Utah Land Office of the Bureau of Land Management. I have no doubt that the plaintiff reasonably assumed that this would be done but there is no evidence of an express agreement between the parties to this effect.

■ Whether notice of the termination of the Hill Creek Unit Agreement was sent to the defendant by the unit operator, Carter Oil Company, rests wholly upon the testimony adduced by plaintiff that the name of the defendant was on the list to be sent notice, that in the regular course of business notices were prepared and addressed to all persons on the list, and that they were mailed to the addressees mentioned on the list. Whether such notice was received by the defendant depends upon the presumption of receipt from the foregoing circumstances, as opposed to the testimony of the defendant that he did not see any such notice and of his wife that it did not arrive at the residence to which it was addressed so far as she recalled and that she would have recalled such notice and discussed it with her husband had it been received. Except for the possible receipt of such notice from the unit operator, there is no evidence on the third issue of whether the defendant learned or was informed by plaintiff or anyone else prior to the anniversary dates of the leases concerning the termination of said unit agreement. No oral evidence was offered by either side and the question was submitted on the stipulation of facts and certain depositions and affidavits which do not permit a very considered resolution of the problem of presumption versus general negative. I am led to find that the notice was mailed by the unit manager but for some undisclosed reason was not received by the defendant. I find, however, that the defendant, under the circumstances, was reasonably put upon inquiry concerning the termination of the unit agreement during or prior to June, 1956.

In the view the Court takes of the case, however, these issues are not determinative. The questions of negligence, contributory negligence, express agreement, notice of the termination of the unit agreement, and the question of whether or not there was a duty immediately to file the assignments for approval do not seem to be determinative.

These diversions seem to have been occasioned by the forms of the assignments, which above the signatures of the parties are absolute on their face, but which set out thereafter a form of "Request for Approval of Assignment", containing, among other things, the following language: "The undersigned agrees to be bound by the terms and provisions of said lease, providing the assignment is approved by the signing officer of the Bureau of Land Management * * *."

Defendant now argues in effect that the qualification in the request for approval of assignment had the effect of

conditioning the assignment as between the assignor and assignee. Thus, both parties are led to a discussion of whether there was an obligation to ask for the approval of the assignment and whether, even though approval had been asked for by the assignee, it would have been granted prior to the expiration dates of the respective leases. Yet, there is nothing at all in the circumstances under which the assignments were made which suggests that they were in any way conditional as between the parties. While it is true that there is strong im, plication of an understanding that the assignments would be filed, and plaintiff's transmittal letter expressly requested their filing, it does not seem to the Court that the case turns upon whether the assignments were filed or should have been filed at a particular time. If they had been filed and the assignments had been approved by the Government, there would have been accomplished a substitution of the obligor under the leases so that both as between the parties to the assignments and between plaintiff and the Government the plaintiff would have been protected. Without such approval, the Government could still look to the plaintiff as the one primarily, or perhaps solely, liable for rentals as far as the Government was concerned. On the latter point it may be that the assignee having gone into possession could also be held by the Government by reason of privity of title, if not of contract. But certainly, without the approval of the assignments by the Government, the plaintiff would not be fully released.

It does not follow that the assignments as between the assignor and assignee were not effective before formal approval by the Government. I will not turn from this thesis to postulate in detail that there is no indication in the record that the Government would not have approved the assignments in due course if request had been made by defendant, or to inquire what the status of the parties would have been had the Government, arbitrarily or otherwise, refused to have approved the assignments upon their submission. All we need concern ourselves with here is that an absolute assignment was made without qualification and with immediate effect as between the parties. Having made the assignments, at least until there was some reassignment by operation of law or by act of the parties the plaintiff had parted with all further control or rights with respect to the leases. If it had attempted without the consent of the assignee to place the leases under Public Law 555 or to otherwise terminate them or to interfere in any other way with the rights obtained by the assignee by virtue of the unconditional assignments, it would have invited liability on its own part.

What is of vital import here is that upon the assignments being made, in the absence of circumstances or agreements indicating a contrary result between the parties, the assignee impliedly agreed to pay, and to become responsible for, the rentals accruing subsequent to the assignments. I have concluded under the circumstances of this case that a trustee, accepting assignments of federal oil and gas leases, in the absence of agreement to the contrary, is liable by implication to his assignor for any rentals necessarily paid by the latter accruing under the assigned leases subsequent to such assignments, notwithstanding that the lessor had not been asked to approve the assignments.

The significance of the defendant's not filing the assignments for approval, as far as the relationship between plaintiff and defendant is concerned, seems to me to relate to the question of whether the assignments were accepted by the defendant, rather than to the question of any tortious breach of duty or damage flowing therefrom. If the assignments were accepted, the duty to pay the rentals devolved upon defendant by reason of such acceptance. The failure to file the assignments for approval by the Government might have given rise to some other claim depending upon other facts and the accrual of other

damages than those involved here. But as far as this case is concerned the duty to pay the rentals as between the parties did not result from the failure to file, and would not have originated from the filing, but, on the contrary, would have resulted as a necessarily implied condition from the agreement to assign and the acceptance of the assignment pursuant to such agreement.

That there was an acceptance of the assignments by the defendant admits of no doubt. He first requested them in his individual capacity. It was indicated to him that the plaintiff would not assign them to him in his individual right, but might be willing to assign them to him as trustee. It was then represented to the plaintiff on his behalf that he desired the assignments as trustee. Assignments were made to him in this form and forwarded to him. The submission of the assignments to him was not conditional. The letter of transmittal was not conditional and the assignments, themselves, were not conditional. The circumstances of the assignments did not suggest any condition which would qualify their immediate effect as between the parties. The request that the assignments be immediately filed for approval did not mean that the plaintiff, or any party, thought that the effectiveness of the assignments between the parties would be delayed until they were filed, for if this were so plaintiff would have retained control of the filing. Plaintiff was properly interested in having them filed because if they were approved the plaintiff would be released from any obligation, both as principal and surety. Unless they were approved, plaintiff might be called upon to pay the rentals at least as a surety; but this did not mean that it would not have the right to reimbursement from the one accepting the assignments.

These principles and results are supported by Thornton on Oil and Gas, 5th Edition. An assignee secured such interest as his assignor had at the time of the assignment. Section 326, pp. 598–599. Generally speaking, if the lease of oil or mining land contains a covenant prohibiting an assignment without the consent of the lessor, such consent cannot be unreasonably refused, or refused to a person of responsibility and respectability. Ibid., § 328, p. 603. Under certain circumstances an equitable assignee in possession may be liable on the covenants of the lease even though there has been no legal assignment, for there is at least privity of title if not privity of contract. Ibid., § 333, p. 607. As a general rule, the assignee of a lessee of a lease takes the position of his assignor and becomes bound by all of the agreements and covenants of the lease to the lessor. Assignees are bound by their acceptance of the lease to make good the covenants to pay rent therein contained. Their liability is upon the covenants, and arises not from any express assumption or agreement to pay it which might be contained in the written assignment but from the privity of estate by reason of their ownership and right to enjoy the benefit of the lease. Of course, an assignment does not render the assignee liable for breaches completed or rentals accrued before he took the assignment. Ibid., § 336, p. 611, also § 337, p. 614. An assignee's liability will be broadened by the terms of the assignment or by a contract outside of it, or it may be narrowed thereby. Ibid., § 339, pp. 616–617. The assignee of an oil lease cannot escape liability on the ground that he never took actual possession, nor commenced operations on the leased premises, the lessor not being at fault, according to the weight of authority. Ibid., § 343, p. 621. A lessee will be released by act of the lessor in accepting and substituting the assignee in place of the lessor, but even though there is no such substitution, an assignee becomes primarily responsible for the payment of rent as between assignor and assignee. Ibid., § 346, p. 622. Especially pertinent is the following:

"§ 349. Liability of assignee to his assignor. (p. 626). Between the assignee and his assignor there

is such a privity of contract as renders the latter liable to the former, without an express contract to that effect, for a failure to carry out the covenants or agreements of the lease. If the lessee (the assignor) has to pay the rent falling due after the assignment, he may recover from the assignee the amount paid; and so if the lessee has to carry out any of the covenants, performance of which was to be made, by the terms of the lease, after the time of the assignment, the assignee will be liable to him for his failure to perform such covenants. * * *"

"§ 350. Assignor liable on account of lease as a surety. (p. 350). The assignment of the lease does not release the assignor from the fulfillment of the covenants or engagements contained in it; and while the assignee continues to enjoy it, such assignor is in the position towards him of a surety, and such assignee is regarded in fact as the principal debtor. * * *"

An instructive case in this connection is Imperial Refining Co. v. Kanotex Refining Co., 8 Cir., 1928, 29 F.2d 193, where it is held that in the absence of any contrary provision in the contract, contract rights may be assigned unless the contract involves personal confidences or personal service; and that the buyer's assignee is bound to perform the contract to purchase the seller's share of oil and the buyer was only secondarily liable as respects indemnity. There is cited with approval in that case the California case of Cutting Packing Co. v. Packers Exchange, 86 Cal. 574, 25 P. 52, 10 L.R.A. 369, 21 Am.St.Rep. 63. The Cutting Company had a contract with one Blackwood to purchase from him certain apricots. The Cutting Company assigned its interest in the contract to Packers Exchange. Blackwood refused to accept the Packers Exchange in place of the Cutting Company but delivered the apricots to the Cutting Company ac-

cording to the contract. The Cutting Company received the apricots and paid for them and tendered them to the Packers Exchange, but the latter refused to accept them. Thereupon, the Cutting Company sold them to the best advantage but sustained a loss for which it sued Packers Exchange. It was held that the original contract was assignable; that the assignment did not relieve the Cutting Company from its obligation to Blackwood; that the refusal of Blackwood did not relieve Packers Exchange from its obligation to the Cutting Company under the assignment. What the Court said in the California case (at page 53 of 25 P.) has application in principle here:

"* * * As between the parties to this suit, the appellant was bound to receive and accept the fruit, and it cannot relieve itself from this obligation to him. * * We therefore think it plain that as the plaintiff, as assignor, was still bound to Blackwood to pay the price stipulated in the contract, notwithstanding the assignment, and as the defendant, as assignee, assumed such obligation, the plaintiff, as between it and the defendant, stood in the nature of a surety for the latter for the performance of the obligation. If this be correct, it then follows that from the assignment an implied contract arose between the plaintiff and defendant, whereby the latter became bound to the former to receive and pay for the apricots, according to the terms of the original contract."

Let it be supposed that there was no tortious wrong and that, thus, there would be no violation of a legal duty in that sense. It is sufficient that there was a contractual duty implied by the inherent nature of the transaction and not negated by contract or circumstances. If there were in addition to this implied obligation an additional obligation, as contended for by plaintiff, to file the assignments of record for ap-

proval, this would simply add force to the basic duty by adding an understanding that plaintiff, through such filing, would be completely released from liability, secondary or otherwise. If there were no such duty to file, and plaintiff's "request" amounted only to that, and not to a condition of the assignment, the basic duty to pay rental as between plaintiff and defendant would not be impaired. If there were not this basic duty to pay rent, the spirit of the law would commend the same result under the circumstances of this case on the theory of estoppel. Resort to the latter doctrine is not necessary, as by fair intendment there was a corresponding contract. It would not be right for the defendant to have the benefit of the leases and the right to realize whatever worth they might prove to have and to bar plaintiff from their control and enjoyment, and yet slough off onto the assignor, as between the parties, the very liability which the assignments were designed and intended to avoid.

That the defendant did not believe that the failure to file the assignments would result in damages, or that he had no reason to so believe, would be pertinent only if a decision were based upon the theory of negligence. In the view the Court takes of the case, liability on the part of the defendant to pay rentals resulted from the acceptance of the assignment, and did not depend upon the additional duty which was perhaps also involved of filing the assignments for approval. However, defendant must have anticipated that if he took the assignments under the circumstances the plaintiff would reasonably assume that he intended to pay the rentals under the lease or to see that the leases were terminated so as to protect him from the necessity of paying those rentals. I feel confident that that was the defendant's own understanding. It may well be that defendant assumed that if rentals were not paid the leases would automatically terminate under

Public Law 555 but such assumption would not protect him from responsibility should he have been in error, as the Court believes he was. Certainly, it would not justify shifting the burden, contrary to the contract of the parties, upon the plaintiff who had nothing to do with any such assumption.

Public Law 555 [3] may not be considered to apply retroactively to contracts entered into prior to its effective date in the absence of consent indicated by the parties to the contract in line with the regulations issued pursuant thereto. 43 C.F.R. § 192.161(a). The changes which the new law involves being substantive rather than merely remedial, it will be presumed that Congress intended them to operate only prospectively. A retrospective or retroactive law has been defined as one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty or attaches a new disability with respect to transactions or consideration already past. 82 C.J.S. Statutes § 412, p. 980. As a general rule, unlike procedural statutes (Missouri Pac. Ry. Co. v. United States, 189 U.S. 274, 23 S.Ct. 507, 47 L.Ed. 811; Silurian Oil Co. v. Essley, 10 Cir., 1931, 54 F.2d 43), substantive statutes are construed and presumed to operate prospectively unless the legislative intent that they be given retroactive operation clearly and unmistakably appears. Sovereign Camp, W. O. W. v. Casados, D.C.D.N.M.1938, 21 F.Supp. 989, affirmed 305 U.S. 558, 59 S.Ct. 79, 83 L.Ed. 352, rehearing denied 305 U.S. 671, 59 S.Ct. 143, 83 L.Ed. 435; Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858. See also 1 U.S.C. § 29. The administrative interpretation of this statute accords with these principles and is entitled to weight. The terms of the statute do not commend any different view.

The argument that there was no assurance that if the assignments had been filed they would be approved by

3. Approved July 29, 1954.

the Bureau of Land Management would be germane only to recovery on the theory of negligence, if germane at all. The assignments were not disapproved. The only reason that they could not be approved was that the defendant failed to file them for approval. It will not be presumed under those circumstances, in the absence of some showing justifying disapproval, that the Bureau would act capriciously and reject them.

■ There is no indication that plaintiff failed to act reasonably to avoid or minimize damage even though this inquiry were pertinent to the question of recovery under the theory of contract rather than tort. The plaintiff, it is true, knew of the termination of the Hill Creek Unit Agreement. It had no duty under the unit agreement to notify defendant and it had the right to assume that the unit manager, in accordance with the agreement, would give such notice. It appears probable that the unit manager mailed the notice, and I have so found. If, as I assume, on the basis of his testimony and that of his wife, the defendant did not receive it, this was no fault of the plaintiff. This much is certain: that the plaintiff had no reason to suppose that the defendant did not know of the termination of the unit agreement, particularly when the evidence indicates that the defendant, both directly and through Ray Senior, was put upon notice that the dominant interests under the agreement were not interested in holding onto the leases and that action probably would be taken looking toward termination of the unit agreement.

■ Nor is the additional theory of contributory negligence suggested by defendant's counsel at the oral argument valid in my judgment. It is true that the plaintiff knew as early as June, 1956 that the assignments had not been filed for approval, and that after notice of unpaid rentals was transmitted to the defendant there was hardly time for defendant to avoid the accrual of the rent by an election to apply Public Law 555. Yet there is no showing that the plaintiff did not act with reasonable promptness and diligence, especially in view of the fact that it had no prior notice that defendant did not wish to go on with the leases. The Court finds that there was no negligence or negligent failure to minimize its damages on the part of the plaintiff.

■ By the defendant's own failure to file these assignments for approval in keeping with the directory provisions of 143 C.F.R. § 192.141(a)(1) [4] defendant cannot be deemed to have effected a reassignment of the leases to plaintiff without the latter's consent and against its wishes. Nor by the same token could defendant shift the consequences of his own failure to plaintiff.

Again, a complete answer seems to be that the risks of uncertainties concerning liability for rentals which might accrue after the assignments and of misunderstanding on the part of the defendant as to whether the leases would be automatically terminated or not under the law, were upon the assignee, not the assignor. It was the former's duty to take action to protect himself against those risks. If he made a mistake, not contributed to by a breach of duty on the part of plaintiff, there appears no justification for shifting the consequences of such mistake to the plaintiff.

■ The contract on which recourse is to be allowed was made by the defendant as trustee, and the question has been raised whether judgment can be entered against the defendant individually in view of this. The general rule is that a trustee is personally and primarily liable upon his contracts as trustee and that he can be sued upon them as an individual, without prejudice

---

4. " * * * Except as to assignments of record title, all instruments of transfer of a lease or of an interest therein, including assignments of working or royalty interests, and operating agreements, and subleases, must be filed for approval within 90 days from the date of final execution. * * * "

to his right to seek contribution from those for whom he has acted. Bogert on Trusts and Trustees, §§ 712–716. It appears probable that judgment against the defendant as trustee would have the same effect as if entered against him individually. The parties should consider which form would best assure the plaintiff the recovery to which it is entitled and at the same time best preserve to the defendant such rights, if any, as may exist in his favor against persons not parties to this action.

On the basis of the stipulated facts and the additional facts determined herein, and in line with the foregoing discussion, it is the conclusion of the Court that the plaintiff is entitled to a judgment against the defendant in the sum of $3,609.50, together with interest thereon at the rate of six percent per annum since December 3, 1956, and costs herein expended. Plaintiff may submit form of judgment within four days, to be settled in the event of objection on my regular rule day, March 6, 1958, at 2 o'clock p. m.